John P. MORGAN, Plaintiff,

v.

FUTURE FORD SALES t/a Sheehy Ford; Future Ford Sales, Inc., a Delaware corporation; and Sheehy Ford Sales, Inc., a Delaware corporation; and other person or persons unknown, Defendants.

Civ. A. No. 92–122 MMS.

United States District Court, D. Delaware.

Aug. 26, 1993.

Victor F. Battaglia, Jr. of Biggs & Battaglia, Wilmington, DE, for plaintiff.

Sheldon N. Sandler of Young, Conaway, Stargatt & Taylor, Wilmington, DE, for defendants.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Defendants have moved for summary judgment on plaintiff's claim under the Fair Labor Standards Act (FLSA), as well as on plaintiff's two supplemental state law claims. Docket Item ["D.I."] 62. In the first count of his amended complaint, plaintiff alleges retaliatory discharge under the FLSA. D.I. 16 at ¶¶ 17, 19 citing 29 U.S.C. § 215(a)(3) (1988). In his second and third counts, he alleges breach of an implied covenant of good faith and fair dealing under Delaware law. D.I. 16 at ¶¶ 25, 31. This Court has jurisdiction over the FLSA claim under 28 U.S.C. § 1331 and over the state law claims under 28 U.S.C. § 1367. For the reasons which follow, defendants' motion for summary judgment will be granted.

### I. Facts

In June, 1989, while plaintiff was working at another car dealership, defendants' general manager, Joseph Healy III, offered plaintiff a job selling cars for defendants. D.I. 68 at B-34. In ensuing employment discussions, plaintiff informed Mr. Healy of a disability which limited plaintiff's ability to sell cars. D.I. 68 at B-34. Because of the disability, which caused fatigue, severe headaches and pain, plaintiff explained, "I couldn't sell as many cars as . . . I did when I used to sell fifteen cars a month." D.I. 68 at B-35—B-37, B-65. Nevertheless, plaintiff told Healy he "was fully capable of performing the duties." D.I. 68 at B-35. Mr. Healy, having learned of the disability, said he had no problem with accommodating plaintiff. D.I. 68 at B-37.[1] Mr. Healy did not, however, offer to hold plaintiff to a lower standard of performance than other salespersons.

---

1. Indeed, plaintiff noted defendant was "very cooperative and very supportive" in response to his disability. D.I. 68 at B-37.

On June 29, 1989, plaintiff completed an employment application and began to sell cars for defendants. D.I. 68 at B–9. Through the course of the summer and early fall, plaintiff apparently performed adequately for defendants took no exception to plaintiff's performance. In November, 1989, however, plaintiff sold only two cars and defendants began to assess plaintiff's role with them. D.I. 64 at A–153; D.I. 68 at B–278.[2]

In assessing any salesperson's performance, defendants do not maintain a rigid formula to determine adequate performance. Instead, a number of factors are considered, including the amount of money a salesperson earns, the number of units a salesperson sells, and the gross commissions a salesperson generates. D.I. 64 at A–230—A–245. In weighing these factors, defendants also consider relevant context, including the time of year, a salesperson's experience or any personal problems a salesperson may have. D.I. 64 at A–152, A–256, A–258; D.I. 68 at B–155. As approximate "rules of thumb", defendants' owner, Joseph Sheridan, explained a salesperson should make $18,000 a year and sell roughly ten units a month. D.I. 64 at A–150, A–229—A–230.

As others in defendants' management pointed out, however, these figures are not litmus tests for termination. D.I. 64 at A–249. Indeed, defendants do not hold their employees to any minimum number of sales per month. D.I. 68 at B–78. Instead of employing a fixed formula for termination, Mr. Sheridan explained, "What we normally will do is at our manager's meeting ... we would have a discussion with the management on the performance of the salespeople and look at those people that are poor performers...." D.I. 64 at A–143. Management would then approach the poorly performing salesperson in an attempt to improve his/her productivity. D.I. 64 at A–170. Thus, in November, 1989, when plaintiff sold only two cars, Mr. Healy and another manager, Eugene Tuer, spoke with plaintiff about his poor performance. D.I. 64 at A–128, A–171. In the effort to boost plaintiff's sales, management eventually took out an advertisement featuring plaintiff. D.I. 71 at Ex. 3.

Despite management's efforts, plaintiff did not improve satisfactorily from his November performance. In December he sold 5 units when the other salespersons averaged 5.5. In January, the salesforce averaged 8.5 units, while plaintiff sold only 4.5 units. Finally, in February plaintiff sold 7.5 when the average was 8.8. D.I. 68 at B–278—B–279; D.I. 71 at C–33—C–34.[3] These lower than average sales figures accompany similarly low income levels. According to plaintiff, for the eight full months during which he worked for defendants, plaintiff earned an annualized income of $14,446.[4] As such, he was the lowest earner among defendants' salesforce during the time he was employed.[5] With respect to the gross commissions earned, only one other individual had a lower averaged gross com-

---

2. The defendant's salesforce averaged 7.7 units per salesperson in November, 1989. D.I. 71 at C–33.

3. His average for the eight full months of his employment was 6.25 units per month. D.I. 68 at B–166. In plaintiff's expert report, it is noted that Gilbert Edwards maintained a lower average of units sold. D.I. 68 at B–166. Defendant has explained that Mr. Edwards was allowed some leeway because of bronchial pneumonia which he suffered in December, 1989, January, 1990, and February, 1990. Nevertheless, Mr. Edwards also left defendant's employment in June, 1990. D.I. 71 at C–30. Plaintiff's expert report also indicates that Herb Hodges maintained a lower average of units sold. D.I. 68 at B–166. Mr. Hodges, however, did not begin selling cars for defendant until March, 21, 1990, or two days before plaintiff was dismissed. D.I. 71 at C–33. Eventually, Mr. Hodges also left defendant's employment. D.I. 68 at B–167.

4. The $14,446 figure is taken from plaintiff's expert report. D.I. 68 at B–164. Plaintiff's expert used an eight-month period for the calculation. Defendant's controller, on the other hand, used the precise term of plaintiff's employment, which would include roughly one week in June and three weeks in March beyond the time used by plaintiff's expert. Under defendant's calculations, plaintiff's annualized income was $13,748.20. D.I. 71 at C–33.

5. Plaintiff's expert report shows Vince Talmo to have a lower annualized income. D.I. 68 at B–164. Mr. Talmo, however, did not begin working for defendant until December of 1989, and his annualized income is lower if the time after plaintiff's departure is calculated. When Mr. Talmo and plaintiff are compared using the time in which plaintiff was employed, Mr. Talmo outperformed plaintiff. D.I. 71 at C–33.

missions than plaintiff during the relevant time frame. D.I. 67 at 11.[6]

While his performance was being evaluated, plaintiff became concerned with whether defendants were adhering to the Fair Labor Standards Act. Throughout plaintiff's tenure with defendants, all salespersons were required to attend mandatory staff meetings on the first working day of every month, as well as supplemental meetings when scheduled. D.I. 16, 17 at ¶ 8.[7] Because of the compensation system used by defendants, defendants may have been responsible for paying some salespersons minimum wage for attending these meetings.[8]

On March 16, 1990, plaintiff contacted the United States Department of Labor, Employment Standards Administration, Wage and Hour Division, to determine whether the employees were owed minimum wage for the time spent in these meetings. D.I. 68 at B–208. In this initial phone call, plaintiff spoke with Compliance Officer James Kimball. Mr. Kimball informed plaintiff that defendants were required to pay the minimum wage for every hour employees were required to attend any meeting. D.I. 68 at B–208. Mr. Kimball told plaintiff to attend the next meeting, and if not compensated, he could file a complaint. D.I. 68 at B–208—B–209. He also advised plaintiff not to talk with anyone about plaintiff's conversation with him. D.I. 64 at A–141.

After speaking with Mr. Kimball, plaintiff ignored Mr. Kimball's advise and relayed the information he had been given to other salespersons. D.I. 68 at B–49, B–172. Not surprisingly, on Wednesday, March 21, 1990,

plaintiff was asked by two of defendants' managers, Gene Tuer and Alexander Morrow, if he had contacted the Department of Labor. D.I. 64 at A–68—A–69. Plaintiff told both managers that he had contacted the Department of Labor. D.I. 64 at A–68—A–69. Finally, in a conversation that same day, plaintiff informed general sales manager Healy of the contact with the Department of Labor. D.I. 68 at B–206.[9]

Two days later, on March 23, 1990, plaintiff was terminated. The precise details of how defendants made the termination decision are not clear. On the morning of March 23, 1990, a managers' meeting was held at which time plaintiff's termination was discussed. D.I. 64 at A–155. At least one of the managers whom plaintiff claims knew about his contact with the Department of Labor, Gene Tuer, appears to have been at the meeting, but testified that the contact with the Department of Labor was not discussed. D.I. 64 at A–130. As to the actual decision to terminate plaintiff, Mr. Sheridan later explained, "it was strictly a unanimous vote in the sales manager's force . . . ." D.I. 64 at A–48.[10]

However, Mr. Sheridan apparently considered the "unanimous vote" of the managers to be only a recommendation. In his deposition, Mr. Sheridan states that he made the ultimate decision to terminate plaintiff. D.I. 64 at A–155. When he made the decision, Mr. Sheridan insists he did not know about the contact with the Department of Labor. D.I. 64 at A–161.

On July 23, 1990, plaintiff filed a complaint with the Department of Labor. D.I. 68 at B–

6. The explanation for the performance of this individual, Mr. Edwards, is explained above. *See, supra,* n. 3.

7. The mandatory staff meetings would began at 8:00 a.m. and usually lasted an hour or an hour and a half. D.I. 68 at B–91. The duration and scheduling of the supplemental meetings varied.

8. Defendant's salespersons were primarily compensated on a commission basis. However, if a salesperson's commissions did not equal or surpass the minimum wage for the hours worked, defendant employed a draw system to insure payment of the minimum wage. Twice during the month salespersons were permitted, but not required, to draw the minimum wage if their

commissions were below the minimum wage level. Those taking a draw would have any commissions exceeding the minimum wage offset by the previously drawn compensation. D.I. 64 at A–215; D.I. 68 at B–15.

9. In his deposition, Mr. Healy denies knowing about the contact with the Department of Labor until after plaintiff's termination. D.I. 64 at A–177—A–178.

10. The conversation, and others, were surreptitiously tape recorded by plaintiff. The conversations have been transcribed and submitted by defendant as part of the record. D.I. 64 at A20–A57.

188. The complaint was based on failure to pay overtime, fraudulent depriving salespersons of commissions and termination because of disability. D.I. 68 at B–189. On February 28, 1992, plaintiff filed a complaint in this Court, D.I. 1, and on August 7, 1992, he amended his complaint. D.I. 16.

## II. *Summary Judgment*

The defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Rule 56 requires the Court to enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. 56(c).

An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

Where there is a dispute, the non-moving party must place in the record sufficient evidence for the Court to find a genuine issue of material fact.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case; and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In addition, with respect to civil rights cases in particular, the United States Court of Appeals for the Third Circuit has explained a court's role is "to determine whether, upon viewing all the facts and inferences to be drawn ... in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Hankins v. Temple Univ.,* 829 F.2d 437, 440 (3d Cir.1987).

## III. *Discussion*

### A. Fair Labor Standards Act

In the first count of his complaint, plaintiff claims defendants violated Section 15(a)(3) of the Fair Labor Standards Act which states, in pertinent part, "it shall be unlawful for any person ... to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter...." 29 U.S.C. § 215(a)(3). In determining whether unlawful retaliation under this provision has occurred, courts have used the shifting burdens analysis articulated by the Supreme Court for Title VII cases in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). *See, e.g., Brock v. Casey Truck Sales, Inc.,* 839 F.2d 872, 876 (2d Cir.1988); *Cuevas v. Monroe St. City Club, Inc.,* 752 F.Supp. 1405, 1410 (N.D.Ill.1990).

The analysis under *McDonnell Douglas* varies depending on whether plaintiff advances a "mixed motive" case or a "pretext" case. As explained by the United States Court of Appeals for the Third Circuit,

> In a pretext case, the employee argues that the employer's facially legitimate reason as stated for the employment decision was false and thus was not the real reason for the decision.... In contrast, a mixed motives case involves proof that the adverse employment decision resulted from a mixture of legitimate and prohibited discriminatory reasons.

*Griffiths v. CIGNA Corp.,* 988 F.2d 457, 468–69 (3d Cir.1993) (citations omitted), *petition for cert. filed,* 62 U.S.L.W. 3093 (U.S. July 13, 1993) (No. 93–134). In this case, at oral argument, plaintiff's counsel eschewed any characterization of his case as a mixed motive

case, choosing to stand or fall on plaintiff's case being solely one of pretext.[11]

In *Griffiths,* the appellate court explained the analysis in a pretext case:

In a pretext case, once a plaintiff makes the *prima facie* case, the burden of going forward shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment decision. If the defendant articulates, through admissible evidence, a legitimate non-discriminatory reason for the discharge, any presumption of discrimination drops from the case, and the plaintiff then must satisfy the ultimate burden of proving discrimination "by showing that the employer's proffered explanation is unworthy of credence."

*Griffiths,* 988 F.2d at 469 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)) (citations omitted).[12]

■ In a pretext case, if plaintiff establishes a prima facie case, and defendant offers a legitimate non-discriminatory reason, plaintiff will survive summary judgment only if he raises "a reasonable inference that the employer's proffered explanation is unworthy of credence." *Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200, 204 (3d Cir.1987), *cert. denied,* 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988), *quoted in Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir.1990). Phrased another way, a plaintiff in the position of Mr. Morgan may survive summary judgment by producing evidence "that the proffered reason is subject to factual dispute." *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 899 (3d Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). *See Jalil v. Avdel Corp.,* 873 F.2d 701, 707 (3d Cir.1989) ("Summary judgment is inappropriate ... if the plaintiff establishes a prima facie case and counters the defendant's proffered explanation with evidence raising a factual issue regarding the employer's true motivation for discharge."), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990). For the reasons which follow, the Court finds plaintiff has established a prima facie case, but has not produced any evidence creating a factual dispute as to the employer's proffered explanation.

### 1. *Prima Facie Case*

■ Under the shifting burdens analysis, plaintiff must first establish a prima facie case. With respect to retaliatory discharge, the United States Court of Appeals for the Third Circuit has stated,

To establish a prima facie case, plaintiff must show (1) that he engaged in protected activity; (2) that he was discharged subsequent to or contemporaneously with such activity; and (3) that a causal link exists between the protected activity and the discharge.

*Jalil v. Avdel Corp.,* 873 F.2d at 708. For purposes of their motion, defendants concede plaintiff has established the first two prongs of the prima facie case. D.I. 63 at 26. The parties disagree, however, on whether plaintiff has established a causal connection between his contact with the Department of Labor and his discharge.

In determining causation at the prima facie stage, some courts have stated that an inference of causation may arise from a relatively short time span between the protected activity and the adverse employment action.

---

11. The colloquy at oral argument was:

THE COURT: Are you asserting a mixed motive or a pretext case?

.   .   .   .   .

... I'm pinning you down, letting you make the choice. All I want to know is what your position is.

MR. BATTAGLIA: We're saying this is a pretextual case.

THE COURT: Not a mixed motives case?

MR. BATTAGLIA: Not a mixed motives case.

THE COURT: ... Now we're dealing with a pretext case only.

D.I. 75 at 24–25.

12. In a recent opinion, the Supreme Court clarified the shifting-burdens analysis announced in *McDonnell Douglas.* The Court held that finding the legitimate non-discriminatory reason to be pretextual does not compel a finding of discrimination. *Saint Mary's Honor Ctr. v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). Under the current law, a separate finding of discrimination must be made, although the Supreme Court was clear such a finding may be based upon rejection of the defendant's proffered reasons. *Saint Mary's Honor Ctr. v. Hicks,* — U.S. at —, 113 S.Ct. at 2749.

*Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1310, 1314–15 (7th Cir.1989) (approximately one week after complaining, plaintiff treated adversely); *De Cintio v. Westchester County Medical Ctr.*, 821 F.2d 111, 115 (2d Cir.1987) ("Proof of a causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment...."); *Strickland v. MICA Info. Sys.*, 800 F.Supp. 1320, 1323–24 (M.D.N.C.1992) ("A causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."); *Cuffy v. Texaco Refining & Mktg. Co.*, 684 F.Supp. 87, 94 (D.Del.1988) ("The proximity in time between the protected action and the alleged retaliation may establish sufficient causation for the plaintiff's prima facie case."). Other courts have expressly required a plaintiff to show a short passage of time between the protected activity and the adverse action as well as knowledge of the activity by the employer. *See, e.g., Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1141 n. 13 (5th Cir. Unit A Sept. 1981) (prima facie case established because of inference arising from "evidence that the employer was aware of the plaintiff's activities and that, within a relatively short time ... the adverse employment consequence took place."), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982); *Jenkins v. Orkin Exterminating Co., Inc.*, 646 F.Supp. 1274, 1277 (E.D.Tex.1986) (employer was aware of employee's protected activities and took adverse action within short time).

In the instant case, plaintiff has shown more than a brief passage of time between his protected activity and the adverse employment action. In addition to the short time span between plaintiff's activity and his termination, plaintiff has established that three managers, Messrs. Morrow, Tuer and Healy, knew about his activity and may have had input into his dismissal.

At the summary judgment stage, "any doubts as to the existence of genuine issues of material fact are to be resolved against the moving party [and] 'inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion.'" *Chipollini*, 814 F.2d at 900 (quoting *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977)). Here, doubts exist as to who was present at the management meeting and who had input into the decision to terminate plaintiff. Viewing the inferences from Mr. Tuer's testimony and the short time sequence for the events at issue in the light most favorable to plaintiff, the Court will deny defendants summary judgment on the ground that plaintiff has not established a prima facie case.

### 2. *Legitimate Nondiscriminatory Reason*

■ To rebut plaintiff's prima facie case, defendants have submitted evidence that they terminated plaintiff on account of plaintiff's poor performance. In determining poor performance, defendants have no rigid formula to decide terminations, but do consider certain data, namely annualized income, commissionable gross income and units sold. With respect to income, plaintiff had the lowest annualized income of any salesperson for the time period he was employed. D.I. 71 at C–33. As to gross commissions, plaintiff's own expert identifies only one salesman who had lower gross commissions than plaintiff for the pertinent eight-month period. D.I. 68 at B–165.[13] Finally, plaintiff had a lower average of units sold than all other salespersons for his entire employment period, with the exception of February and a portion of March of 1990. In light of this evidence, the Court finds defendants have produced a legitimate non-discriminatory reason for dismissing plaintiff.

### 3. *Plaintiff's Ultimate Burden*

■ Having established a legitimate non-discriminatory reason for plaintiff's discharge, "to meet its burden on summary judgment, the defendant employer must show that the plaintiff will be unable to introduce ... indirect evidence of [a purpose to

---

13. This individual, Gilbert Edwards, suffered from pneumonia for three of the relevant months and was eventually terminated in June, 1990. D.I. 68 at B–167; D.I. 71 at C–30.

discriminate]," i.e., plaintiff will be unable to show there is a material issue of fact with respect to the proffered reason. *Chipollini* 814 F.2d at 899. Defendants have maintained that plaintiff was dismissed for poor performance and asserts plaintiff has not offered sufficient evidence to create a factual dispute. Viewing the record as a whole, the Court finds plaintiff has not raised an issue that defendants' "proffered reason is subject to factual dispute." *Chipollini*, 814 F.2d at 899.

Plaintiff cannot point to a single salesperson who performed worse in any of the pertinent categories and nevertheless was maintained as a salesperson by defendants. Once his performance came under review in November, plaintiff had only one average performance and otherwise had a sub par performance.[14] At best, plaintiff has shown that, at times, other individuals performed worse, but those instances have been explained or those individuals no longer work for the defendants. In light of this evidence, the Court does not find "sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987). For this reason, defendants' motion for summary judgment on the first count of plaintiff's complaint will be granted.

## B. State Law Claims

### 1. *Count II*

■ With respect to the second count of his complaint, plaintiff alleges defendants breached the implied covenant of good faith and fair dealing "by summarily discharging him for acts that the [Fair Labor Standards

Act] and public policy would encourage...." D.I. 16 at ¶ 25. Defendants maintain that any such claim is pre-empted by the exclusivity provision of the Fair Labor Standards Act.[15] In response, plaintiff argues that while the FLSA applies to his own contact with the Department of Labor, the advice and information he offered to his co-workers is not protected by the FLSA and his only recourse is state law.[16] For the reasons which follow, the Court finds the FLSA covers plaintiff's contact with his co-workers and accordingly his claim is pre-empted.

The FLSA antiretaliation provision forbids adverse employment action against "any employee because such an employee has filed any complaint ... or caused to be instituted any proceeding under or related to this chapter...." 29 U.S.C. § 215(a)(3). Under this language, activity beyond the filing of an employee's own complaint is protected. The language addressing acts by which an employee "caused to be instituted any proceeding" does not cover an employee's own complaint, which is expressly covered. Instead, this language protects actions of an employee which may cause third parties to institute their own proceedings. *See Employees Protection Under § 215(a)(3) of Fair Labor Standards Act*, 101 ALR Fed. 220, §§ 13–15 (circulating petitions and posting of information among the activities protected under the Act).

While plaintiff has not shown any other employee actually instituted proceedings under the FLSA, the conclusion that the FLSA nevertheless protects his activity is strengthened by the liberal construction given to the Act by courts. As the United States Court of Appeals for the Third Circuit has explained, "The Fair Labor Standards Act is

---

**14.** Indeed, plaintiff does not directly address the data offered by defendant. Defendant rests its non-discriminatory reason on figures taken from the time period during which plaintiff was employed. In contrast, plaintiff's expert incorporates data arising *after plaintiff's termination*. Even considering the post-termination data of the three salespersons identified in plaintiff's expert report as having sustained performances worse than plaintiff's, Messrs. Talmo, Edwards and Hodges, none remain employed by defendant.

**15.** In the alternative, defendant argues that plaintiff has not stated a cause of action under

Delaware law. Because the Court finds count two of plaintiff's complaint pre-empted, it does not address whether plaintiff has stated a claim for unlawful discharge under Delaware law.

**16.** Plaintiff only argues that the encouragement of his co-workers is not protected activity. Plaintiff has not disputed that if the activity is protected, the FLSA pre-empts any state law cause of action. As defendant points out, the case law supports pre-emption. *See, e.g., Tombrello v. USX Corp.*, 763 F.Supp. 541, 545 (N.D.Ala.1991).

part of the large body of humanitarian and remedial legislation enacted during the Great Depression, and has been liberally interpreted." *Brock v. Richardson,* 812 F.2d 121, 123 (3d Cir.1987) (Act applies when employer merely believed an employee engaged in protected activity). A liberal construction is required because, as the Supreme Court has found, instead of "detailed federal supervision", Congress "chose to rely on information and complaints received from employees seeking to vindicate rights claimed to have been denied." *Mitchell v. Robert De Mario Jewelry, Inc.,* 361 U.S. 288, 292, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960). The purposes of the Act are furthered by insuring employees have information which would increase awareness of their rights under the FLSA. Plaintiff's activity in communicating with his co-workers furthers that goal. It follows plaintiff's communication with his fellow employees would be protected activity under the Act. Because plaintiff has not disputed pre-emption by the FLSA as long as protected acts are at issue, finding his activities protected by the Act requires the Court to find his state law claim pre-empted. Accordingly, the Court will grant defendants' motion for summary judgment with respect to Count II of plaintiff's complaint.

### 2. *Count III*

In the third count of his complaint, plaintiff again alleges defendants breached the implied covenant of good faith and fair dealing when they terminated plaintiff.[17] His claim rests on the Delaware Supreme Court's recognition of an implied covenant of good faith and fair dealing in employment contracts in *Merrill v. Crothall–American, Inc.,* 606 A.2d 96 (Del.1992). In recognizing an implied covenant of good faith and fair dealing, the Delaware Supreme Court stated that to breach the covenant

> "the conduct of the employer must constitute 'an aspect of fraud, deceit or misrepresentation.'" ... An employer acts in bad faith when it induces another to enter

into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some way material to the contract.

*Merrill,* 606 A.2d at 101 (quoting *Magnan v. Anaconda Indus., Inc.,* 37 Conn.Supp. 38, 429 A.2d 492, 494 (1980) (quoting *A. John Cohen Ins. v. Middlesex Ins. Co.,* 8 Mass. App. 178, 392 N.E.2d 862 (1979)). To state a claim based on the covenant, plaintiff argues that, after hiring plaintiff cognizant of his disability, defendants engaged in a course of conduct which bound defendants to hold plaintiff to a lesser standard.

Despite the clear language of *Merrill* requiring "fraud, deceit or misrepresentation" at the time of hire, plaintiff has produced no evidence that defendants acted deceptively in any manner. For this reason alone, plaintiff has failed to establish a claim for breach of the implied covenant of good faith and fair dealing.

Faced with the fact that there was no promise of special treatment with respect to performance at the time of hire, D.I. 67 at 21, and no deception by defendants, plaintiff nonetheless urges the covenant was breached because defendants' course of conduct bound them to an unexpressed obligation. In short, plaintiff urges the accommodation and cooperation offered by the defendants to the plaintiff be used against the defendants. One need not tarry over plaintiff's position. By definition, a course of performance during performance of a contract cannot constitute deception inducing the plaintiff to become an employee of defendants. Defendants will be granted summary judgment on Count III of the complaint.

### IV. *Conclusion*

For the forgoing reasons, defendants' motion for summary judgment will be granted. An appropriate order will issue.

---

17. As with the second count, defendant argues that plaintiff's claim is pre-empted. Defendant argues the Delaware Handicapped Persons Employment Protection Act, Del.Code Ann. tit. 19, §§ 720–728 (Supp.1992), pre-empts plaintiff's third count. Plaintiff, however, has not argued he was dismissed because he was handicapped. If he had, the pre-emption issue would arise. Instead, plaintiff has fashioned his claim as one of breach of an implied covenant pursuant to which the parties agreed to certain conditions involving plaintiff's medical difficulties.